**FILED - GR**
November 2, 2018 4:11 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY:_mkc__ SCANNED BY: KW/ 11/5

**UNITED STATES DISTRICT COURT**
**for the**
**Western District of Michigan**

**1:18-cv-1231**

**Janet T. Neff**
**U.S. District Judge**

Jane Doe                                     )
P.O. Box 230721                              )
Grand Rapids, MI 49523,                      )
                                             )
            Plaintiff,                        )
        v.                                    )
                                             )  Case No.:
Ben Carson, as Executive Director,           )
U.S. Department of Housing and Urban         )  NO JURY REQUESTED
Development,                                 )
451 7th Street S.W.,                         )
Washington D.C. 20410;                        )
                                             )
Earl Poleski, as Executive Director,         )
Michigan State Housing Development           )
Authority,                                   )
735 E. Michigan Ave.                         )
Lansing, MI 48912;                           )
                                             )
and the United States,                       )
Office of the Attorney General               )
Department of Justice                        )
950 Pennsylvania Avenue, NW                  )
Washington D.C. 20530;                        )
                                             )
United States Attorney                       )
5 th Floor Law Bldg.                         )
330 Ionia Ave. N.W.                          )
Grand Rapids, MI 49503,                      )
                                             )
            Defendants.                       )

**COMPLAINT**

## SUMMARY OF THIS LAWSUIT[1]

*Plaintiff, Jane Doe, filing Pro Se, is a participant in the Housing Choice Voucher Program (Section 8), funded by the U.S. Department of Housing and Urban Development (HUD) upon receipt of Congressional appropriations, and the HUD grant is administered in this case by the Michigan State Housing Development Authority (MSHDA). Doe is bringing suit due to on-going discriminatory practices by defendants in violation of Section 504 of the Rehabilitation Act of 1973 (Codified at 29 U.S.C. §791 et seq.); the Americans with Disabiilities Act of 1990, as Amended (Codified at 42 U.S.C. §12101 et seq.).*

*Doe's disability is brain dysfunction (hereinafter referred to by the colloquial term "mental illness") which renders organizational tasks exceedingly difficult and require an immense amount of time in excess of most people. Doe's perception of time is distorted and her spatial ability is severly impaired. These have been described as a thought disorder. She feels like she drifts through life and is more like watching it go by from a distance and feels helpless to fix things that seem wrong in spite of trying her best. She feels overwhelmed in the functions of daily tasks and frequently battles mental blocks, paranoia, and feels like life is an emotional roller coaster, this labeled as a mood disorder. It is for this reason that Doe went a period of about five years of no income before she concluded a social security application. It is due to her church, ex-husband (now deceased), and veterans organizations that she got through that hard time. It wasn't a delay on the part of Social Security. It took them about 90 days to award disability benefits after the application was completed. Her only relationships are with her children and she literally has no friends. She keeps the shades closed in her house always unless a window is cracked open, but at the same time must have blazing lights in the house at all times including at night. There are so many facets of the problem that it's very hard to convey to anyone how many areas of life are impacted. And it's very frustrating for her not to be understood. Or rather, understood only by her children (and psychiatrist). People think if you walk and talk, and see and hear that you are fine. But if you see without perceiving and hear without processing, those limitations are perceived as a bad personality rather than a disabling condition.*

*Doe seeks equitable relief for various claims in the forms of Specific Performance, Injunctions, a Declaratory Judgment, and costs including attorney fees and expert witness fees. Later in this complaint in part of the remedies section it is stated that the judge in their discretion may appoint an attorney, so that is also requested. Doe tried calling a dozen attorneys, and to get references from veterans and disability groups for legal help but no one was willing to work without being paid on some chance of being awarded attorney fees at the conclusion of the case. Additionally, Doe would like the option of amending her complaint as needed.*

*Doe has had a mental block for quite a while in trying to fit this situation into the format of a complaint. She is trying provide information in a semblance of what she thinks is needed. She is relying entirely on federal law because it would probably take a long time and would take a mental shift to look at state law. She has read a good bit of Constitutional law, but would*

---

1   This summary is not part of the complaint but is provided for the convenience of the Court and the Parties.

*prefer to amend the complaint with those claims (substantive and procedural violations of due process) if matters cannot be resolved by federal law.*

## JURISDICTION, VENUE, AND RIGHT OF REVIEW

1.      This Court has subject matter jurisdiction over this case under 28 U.S.C. §1331 which provides, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

2.      This Court has jurisdiction over the request for declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §2201, that provides, in relevant part, "In a case of actual controversy within it's jurisdiction, ...any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

3.      This Court has the right of review under 5 U.S.C. §702, which states that "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States...a judgment or decree may be entered against the United States;

Provided That any mandatory or injunctive decree shall specify the federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance."

3.5    Venue is proper in the county where the acts of discrimination occurred. (28 U.S.C. §1391(b)(2). The acts of discrimination were affected in Kent County, MI where Doe resides.

4.    The state is not entitled to immunity under the 11th amendment in either state or federal court for violations of the requirements of Chapter 126 Equal Opportunity for Individuals with Disabilities under the Public Health and Welfare laws of the United States in Title 42 of the United States Code. (42 U.S.C. §12202 )

5.    Doe found in caselaw that a statute of limitations for these disability claims would be the same as the state's tort statute which in Michigan is 3 years. The first point where Doe had an inkling of a problem was November 2, 2015. The discrimination has continued over the entire period of residence and has not abated. It would be equitable that if it were found that these claims for any reason don't correspond to the appropriate limitation, that the Court would grant an allowance to be able to go forward in light of Doe's medical condition.

## PARTIES

6.    Doe became a 'participant' in the Housing Voucher program and used a Section 8 Voucher in 2008 in Florida and moved her household to Grand Rapids, Michigan in October 2013.

7.     MSHDA in Lansing coordinated the transfer of the voucher on the Michigan end. In disability laws, the role of MSHDA is called the 'public entity' being the state or local agency who directly interfaces with program participants (Doe in this case) (42 U.S.C. §12131(1)); MSHDA is also the 'recipient' as in the recipient of the HUD grant for program administration.

8.     HUD provides the money and oversight control of grant recipients, like MSHDA, for the Housing Voucher program. HUD is referred to as the 'agency' in disability statutes as the federal agency with oversight control.

9.     The United States provides the money through appropriations and delegates the authority of the overall program administration of the Housing Voucher program to HUD to support the housing needs of impoverished individuals in the United States.

## STANDING

10.     The Plaintiff bringing this action is a qualified individual with a disability: with disability defined as a physical or mental impairment that substantially limits one or more major life activities, those including caring for oneself, performing manual tasks, concentrating, thinking, working and others. 42 U.S.C. §12102 (1)(A) and (2)(A). Doe has medical records which have established her as being disabled and unable to work. This is affirmed as having been determined to be completely disabled by the Social Security Administration and these statements are provided to MSHDA. Doe as a 'qualified individual with a disability' is an individual with a

disability who with or without reasonable modifications to rules, policies, or practices...meets

essential eligibility requirements for the receipt of services or participation in programs. 42

U.S.C. §12131(2). Doe is already a participant in the Housing Voucher program having met the

essential requirements.

## FACTS OF THE CASE

11.     Does daughter had been a member of her household from the time Doe used her first

voucher in 2008, and still was when Doe transferred her voucher from Florida to Grand Rapids,

Michigan in fall 2013. Doe's daughter decided to pursue additional schooling in Chicago in the

fall of 2013, and Doe wanted to be near her son, and located so it wouldn't be difficult for her

daughter to come home on school breaks. It was of critical importance to live near her son since

her daily interactions with her daughter would necessary be less while her daughter was again in

school. Doe has no car, so the challenge in finding a new place would be to find a place near her

son who was living in Midtown, and that was affordable and with a landlord willing to accept a

Section 8 voucher. Doe's son had lived in Grand Rapids for 4 years at that time, from the time

he graduated from Hope College in 2009.

12.     The voucher for the move was for the standard 60 days, but approximately 30 days of that

was spent in Florida getting ready to move. Before Doe moved, Doe pulled up some information

on the internet regarding the transfer of vouchers and saw that HUD had proposed in the Federal

Register that instead of having only a 60 day window total, a person should be given a 30 day

extension. This rule change proposal was published March 28, 2012. This has since been

implemented as law at 24 CFR §982.355(c)(13) . They were acknowledging that a person who is
moving has to close up one household and cannot immediately have a place to move to. This
extra 30 days for all participants was not yet in effect at that time. But to Doe's way of thinking
since HUD already saw the need for *everyone* to have this cushion and they also acknowledged
that disabled persons could need more time than normally functioning individuals (24 CFR
§8.28(a)(4)). That would seem to make it a point of logic that a disabled person might in fact
need another 60 days.

13.     Doe requested an extension of the voucher. The only things Doe figured out before
moving was about everyone needing an extra 30 days and the other thing was that the receiving
Public Housing Agency (PHA) was required to issue a new voucher when she arrived to this
location, (unless she arrived after the first voucher expired, in which case the receiving location
would have to get permission from the office that issued the first voucher to extend it).She
arrived approximately one month before the first one expired. The receiving office was required
to issue a new voucher., they didn't have to extend the expiration date, but had to issue it. And
after issuing it, it was up to them to extend it.

14.     Things were fairly chaotic making the move. Doe's son was renting a room in a house
with 2 other guys, but looking to move in the same neighborhood. Therefore Doe needed to live
in the same area. She put her property in a storage unit till she found a place. She didn't know
the area, the city at all, so had to get familiarized with the housing and transportation situation.
Her son was just starting a new job and wasn't really able to go around much. Seemed like rents
were fairly high. It made the options narrow to live near her son. Doe isn't all speed ahead doing

anything. It's more like taking one step after another at a snail's pace. That's her life. She requested an extension to her voucher. The local MSHDA office said they had to ask someone in Florida. Doe said she thought they it was up to them to extend the voucher. The representative at the MSHDA office had no idea what she was talking about. It was at that time Doe knew she needed help. The local office knew Doe was disabled. It was in the records that transferred and she told them. She empasized to them that she needed to live near her son. None of that mattered. Doe got a statement from her doctor. Doe was requesting to have an advocate at the agency to help represent her interests. If they weren't using the CFR and were entirely indifferent to her ability to keep from losing her voucher, those were bad signs. This doctor's statement was faxed to the local MSHDA office, and it was in the DOJ and HUD complaints Doe has submitted. Doe saw a recent statistic that about 40% of voucher holders lose them while they are looking for a place to live that's in the budget and with a landloard who accepts the voucher.

15.     Doe was told right before the first one expired that she could have a 30 day extension. And it turned out the voucher was issued by the local office, not in Florida. Even 30 days was a pressurized deadline around the time of Thanksgiving and Christmas. Doe was able to get a place, but not before crying on the phone to the MSHDA office. And feeling sick daily from the intense pressure. The place turned out to be .6 mile from her son. Walkable. In title 24, Part 8 at 8.28(a)(4) it says that the PHA should take into account the special problems locating an appropriate unit could be for a disabled person when considering requests for voucher extensions for handicapped persons. Even in this case, Doe needed a sixty day extenstion so she could calmly look for housing without feeling like there was a pistol to her head and that she was at great risk of losing her voucher. That didn't mean it would take sixty days. It meant she could

look more effectively. The pressure of having to find a place makes it harder for people who experience stress like Doe. In 24 CFR 982.303(b)(2) it states that if a family needs and requests an extension of the initial voucher term as a reasonable accomodation to make the program accessible to a person with disabilites, the PHA *must* extend the voucher term up to the term reasonably required for the purpose.

16.     Doe's landlord came to her door with some papers from MSHDA on January 4, 2014. Doe needed to pull together some papers including medical receipts and since the boxes were stacked ceiling high in a·10x10 storage unit, it wasn't until February till most of them were sent. In batches. One time she wasn't able to make copies not thinking it would be any problem for them to copy them and return the ones she sent. Those were not returned, she was later told that they didn't have those, but they never were returned in the mail. Some receipts were sent by fax. The last ones sent around March 4th. Doe had a question about the requirement and when the local office hadn't return her call, she called Lansing to ask the question. She asked what the status was on her request to have an advocate and was told the local office would be following up. They never did.

17.     MSHDA had sent one rental amount for Dec 2013 to the end of Feb 2014 and then a new period was starting. She didn't get any mail from them before March and Doe's landlord told her the amount of rent she was supposed to pay. In fact, she didn't get any mail from them till around the beginning of December 2014 saying if Doe didn't send certain papers they would terminate her voucher from a date that was a week off. She had no idea what they were talking about. In a panic, Doe sent a letter to the Acting Executive Director of MSHDA at that time. A

lady called her shortly after that from the Lansing office and explained that the local office was going to send the papers they wanted and to complete and return them. That was done.

17.5     Meanwhile Doe's landlord sold his building and Doe was told on December 23, 2014 that Doe would have to move so he could renovate. So all of a sudden, Doe needed to move again. Strangely enough, Doe fairly quickly found a good place that had a low rent and was closer to her son. Doe sent a letter to MSHDA about a week into January that she needed to move again and had found a place and wanted to move in 30 days. They didn't respond quickly. When they did she was told she could not move in 30 days. At that point they told her she wasn't going to be able to move until March 1, 2015 which would be 7 weeks from when she was approved by the landlord at the new place. It looked like really bad news. Who ever heard of a landlord being willing to wait seven weeks for a new tenant to move in? Doe was trying not to panic but was pretty distraught. She called the lady in Lansing who had called her about the papers in December to find out if there was any possible way to move in the 30 day window. She said no, it was required to only move on the 1st of the month.

18.     Amazingly, the landlord waited. Doe found out later that HUD published in the Federal register in the proposed rule January 6, 2015 HUD stated, "Under current regulations, there is no option for PHAs to adopt policies regarding the date when a tenant may move into an assisted unit once the unit is ready for move-in." The property Doe was renting was vacant. It stated that since they were currently paying overlapping rents between people moving between apartments, they wondered if that was a change that should be considered. In a rule published in the Federal Register March 8 2016, at Start of Assisted Tenancy  they they decided against promugating this

change. The respondants had said resoundingly such a rigid requirement would harm tenants. In June 2016, MSHDA sent out a reminder of some of their rules, one of them being the requirement of moving on the first of the month. Unlike the rest of the country in the HUD program. Not only did Doe get an apartment that met her needs, is was oddly priced much lower that other housing in the area. A two bedroom place a block away had a rent more that double the amount of Doe's apartment. A one-bedroom unit next door is almost double the rent, but that one is brand new, and Doe's is circa 1970's décor with a cupboard that has to continually be reattached when it falls off. The rents in this part of the city are high and likely to keep going up with the on-going development on Michigan Street.

19.     There were a bunch of other more minor issues. Doe still never got a copy of the rent determination of the period starting March of 2014 which Doe kept requesting for her records. Those dates were provided to HUD when Doe filed a complaint. In September 2015, Doe's daughter took a job in Chicago and was leaving the household, so Doe reported this and MSHDA sent an acknowledgement with a de minimis change in the amount of rent. The main recalculation was to occur for the next period of March 1, 2016. The letter sent by MSHDA at that time had a second page that showed Doe's Medicare payments relative to her adjusted income. Doe wondered why those were in isolation from the other medical expenses and disability deduction to arrive at the adjusted income number. The lady she called in Lansing on November 2, 2015 was pretty short and said why didn't Doe say anything before? Doe had only received a second page like that on January 4, 2014 before she had submitted the receipts for the other medical expenses. So there was no occasion to ask about it. The lady in Lansing called her back and explained that her daughter's contacts weren't covered. There was another thing she

said wasn't covered as if that explained everything regarding the deduction of any medical expenses. I had to correct her that contacts were on the IRS list of approved deductions. (More detail and dates were sent to HUD and DOJ already). Doe sent a letter to the lady in Lansing November 18, 2015 asking for information on the adjustments to income at that point doubting the disability adjustments and the deduction for when Doe's daughter was a full-time student were even included in any figuring in. When Doe didn't have a response by February she saw on the internet that someone could submit a complaint about any federal agency by sending it to the Department of Justice. Doe sent a complaint to them at the end of February. After 5 months, in April 2016, she got a response from the Lady at MSHDA who said that the disability and student deductions had been factored in adjusted income, but other medical expenses had not been, but she was only willing to make any corrections from March 1, 2016. No changes were ever made. She also said they had no medical receipts for Doe's daughter. She seemed to have forgotten saying at the beginning of November prior that her daughters contacts couldn't be deducted, meaning obviously they had had receipts for Doe's daughter. Both the Code of Federal Regulations and the U.S. Code state that deducting the medical expenses that exceed 3% of annual income is "mandatory." (24 CFR §5.611(a), 42 U.S.C.§1437a(5)(A)(ii)). Since Doe knows that the PHA lost a number of receipts based on those communications, Doe will copy those again for them to get the situation rectified upon the order of this court.

20.     Doe later found out that just as income is evaluated on a projection for the coming year 24 CFR 5.609, the medical expenses are also supposed to be estimated for the coming year, not taken from the receipts of the prior year. That makes sense at a certain point, lkely because the medical deductions had not been made, Doe was unable to make timely payments to the VA and

had gottten a certain amount of money forgiven from the total due. More than once, the VA sent Doe's medical debt to the Department of Treasury to be held from her social security. The last time that happened Doe called Treasury to see what else they were holding and paid the amount due before it was withheld again. The PHA may use the past as an indicator of the upcoming year. Doe's medications she obtains at the VA cost approximately $50/mo. Additional prescriptions obtained outside the VA cost about $75 a year. Doe can rarely go to the dentist, but if that becomes a possibility it would be an extra maybe $300? A rule published by HUD in the federal register on March 8, 2016 discusses this, section labled Streamlined Annual Reexaminations for fixed incomes. HUD seems to make the point that it's incongruent to be putting income from the past year together with projected medical expenses for the coming year. That makes sense both ways. The income and adjusted income based on expenses should be for the same timeframe.

21.     Doe gets her mail at a P.O. Box. That's the only place Doe gets mail—or has ever received mail in Grand Rapids. It is entered on the housing forms when they as for mailing address. Several reasons, 1. Mail is stressful, so it can't be received everyday. Get the stress once or twice a month., 2. Mail used to pile up because it was too stressful to look at everyday. Then stuff would get buried in piles before Doe even opened it., and 3. Doe feels like her privacy is invaded when her mail is sitting outside in a box. Doe has requested of MSHDA that they call when they are mailing anything that requires attention or a response because of only going to the box once or twice a month. That has happened about twice in December 2014. The last time Doe was given a commitment they would do that was in a letter in April 2016. They never called when they sent anything after that time. There is a requirement at 24 CFR 8.6(a) that the

recipient take appropriate steps to ensure effective communications and at 8.6(a)(1)(ii) that they give primary consideration to the requests of the individual with handicaps.

22.     When Doe had not heard back from the DOJ for 4-5 months, she sent a packet of information to the Equal Opportunity office at HUD in D.C. About that time she received a letter from DOJ that they had sent the original binder of information to the HUD Equal Opportunity Office. The binder was meticulously put together with a detailed index. There were copies of communications, records of phone bills and other information to understand the situation. To photocopy half the information in the binder cost $20. In the binder were three main requests. First, to go back and refigure the rental amounts with proper deductions of the medical expenses. Two, Provide an advocate as had been requested in 2013. At some point in 2015 the lady in Lansing said she would be Doe's advocate it was after that that the same lady waited five months to respond to Doe's letter of concern about proper income adjustments. Having an advocate would solve the problem of the regular staff needing to call when they mailed stuff. The advocate would be getting duplicates of what Doe was sent and be able to monitor that information required and deadlines were understood. And would verify that the PHA was following disability and housing law and figuring rental amounts accurately Doe can't keep trying to read law indefinately and she shouldn't be required to. The third was a request that Doe be given an exception to the standard calculations to fair market rent to 120%, an acceptable disability accomodation in the regulations. An explanation of fair market rents is at 24 CFR §888.111 and §888.113. §982.503(b)(5) says the PHA may establish an exception payment standard of not more than 120% of the published fair market rent (FMR) as a reasonable accomodation for a family that includes a person with a disability. In the rule published by HUD

March 8, 2016, HUD states on the issue of Unit Special Features, it says a PHA must take special features into consideration when there is a reasonable accomodation request., and "a PHA must provide a higher payment standard if requested as a reasonable accomodation for a family that includes an individual with disabilities."

23.    When Doe's daughter moved out, Doe requested to still have her rent determined as a two bedroom unit. By figuring a two bedroom unit as a one bedroom unit which they began doing, Doe pays the balance of rent over a certain amount because the HUD allocation covers less. Doe explained her financial circumstances and begged MSHDA to see if there were some way to keep the two bedroom allocation and was told there was no way to do it. Doe having moved twice in 2 years at that point was emotionally exhausted from moving and always paying storage fees, and paying for the things already in Michigan to be in storage again was an expensive thing. Doe doubted it would be easy to find a one bedroom unit with the necessary storage space. At a point in early 2018, Doe calculated she had paid around $6,000 in storage fees between Michigan and Florida. Part of Doe's disability is the challenge to organize her physical environment. This used to be impossible, but Doe has made incremental improvements as medicine changes helped her more. This led to having a number of boxes of things that still need sorted and determinations made of what to do with items. Doe's boxes fill half the basement right now and she works on getting through the items slowly. Needing to study housing law has made that task much harder to achieve. Particularly boxes of paper take time. Doe needs to separate important documents from those that can be discarded and also segregate things that are sentimental. Doe returned to Florida in the spring to pull the other half of her things out of storage, that she couldn't fit in the moving truck when she moved. The interest on the credit card

was less than the monthly storage fee, and the storage fee was endless and kept going up.

Besides which there was always a stress in the back of her mind to feel split up like that. She has

actually decided she will get rid of the German baby buggy, but she didn't want to lose half of

her stuff without knowing exactly what was there. The other reasons Doe would have found

moving difficult is to try to find another place near her son. He moved in around the fall of 2015

from having his own apartment, to sharing a house rental with two other individuals. He is now

1.1 miles from Doe. She sees him 3-5 times a week. In the winter she mostly took Lyft. He

isn't close to a bus stop, unless you consider half a mile close. For a long time Doe was anemic

and everything took extraordiary effort. Doe calculated she has spent about $80/month going

back and forth spending time at her son's house for the last one year. She is still in fairly good

proximity to where he lives. If she was further than a mile away, it could be difficult and more

expensive. Bus changes take lots of time and buses only run at restrictive hours. The other

reason Doe's location is of particular importance is being steps from being able to get milk,

bread, and fruit and vegetables and meals at the corner store. Doe isn't able to coordinate and

effectuate preparing meals, and there are times she has mental blocks about leaving the house.

Having a corner store is a life-saver. Per 24 CFR §982.517(e) it indicates utilities must also be

calculated for the two bedroom unit on request from a family as a reasonable accomodation to

make the program accessible to and usable by the family member with a disaability.

24.     But back to the point of MSHDA telling her that factoring her rent still at a two bedroom

unit is impossible. Rent has since found out, she thinks it was after she sent the extensive

information to DOJ that Doe could have been permitted to still have the two bedroom factor for

one of two reasons. Because she was a remaining family member so people aren't forced to

move to keep their rent affordable, and as an accommodation for disability. (24 CFR §984.402(b)

(8)) Under Title 24, Part 8 in the CFR at 8.3 is a definition of 'adaptability' in terms of a dwelling

unit for a disabled persons. It lists things like counters or sinks lowered, grab bars etc. but the

last sentence there says, "...or to accommodate the needs of persons with different types or

degrees of disability." Doe doesn't need two bedrooms, but she needs to not have to move, to

have the basement, to be close to her son and close to food. That can be accomodated in the law.

Later Doe saw a paper from MSHDA saying if a disabled person had an extra bedroom, they will

inspect and better find that room being used for medical equipment. They clearly don't

understand that disabled persons can have variable circumstances and needs. At Title 24 at 8.33

Housing adjustments, it states that the PHA should modify housing policies and practices to

ensure they don't discriminate on the basis of handicap, and they may not impose policies that

have the effect of limiting the participation of tenants with handicaps.

25.     Without the proper medical adjustments and accommodations, Doe's credit card debt has

gone up by $5,000 in addition to the $2,000 spent going to Florida to retrieve property from

storage.

## REVIEW OF THE LAW

26.     The ADA Amendments as of 2008, "An act to restore the intent and protections of the

Americans with Disabiilities Act of 1990." (PL 110-325 (S 3406) September 25, 2008). The

impetus for the Act was the imposition of severely restrictive criteria the courts were imposing

on plaintiffs to obtain relief under the original statute of 1990. (Pub.L. 110-325, §2(a)(4)-(7),s

Sept. 25, 2008, 122 Stat. 3553.) Under Chapter 126-Equal Opportunity for Individuals with Disabiilities, 42 U.S.C. §12101(a) it states, "Findings. The Congress finds that-(1) ...many people with physical or mental disabilities have been precluded from" being able to "fully participate in all aspects of society...because of discrimination." 42 U.S.C. §12101(a)(2) states "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;" "(3) discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services." Para.(4) indicates that historically disabled persons had no recourse to redress discrimination. Para. "(5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusions, the discriminatory effects of...communication barriers,...failure to make modifications to existing...practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." "(6) census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally." "(7) the Nation's proper goals regarding individuals with disabilities are to ensure equality of opportunitiy, full participation, independent living, and economic self-sufficiency for such individuals; and (8) the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis..." 42 U.S.C. §12101(a)(1)-(8).

27.     Discrimination is defined at 42 U.S.C. §12132. "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  Many statutes and code provision are expressing the same matter, like this statement is also at 28 CFR §35.130(a).

28.     42 U.S.C. §12201(a) states "nothing in this chapter shall be construed to apply a lessor standard than the standards applied under title V of the Rehabilitation Act of 1973 (29 U.S.C. §790 et seq.) [§790 was repealed so these actually start at §791] or the regulations issued by Federal agencies pursuant to such title."  A review of the standards in the Rehab Act and regulations pursuant to that title, [                    ]

29.     42 U.S.C. §12201(f) states "Nothing in this chapter alters the provision of section 12182(b)(2)(A)(ii) of this title, specifying that reasonable modifications in policies, practices, or procedures shall be required, unless an entity can demonstrate that making such modifications in policies, practices, or procedures...would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accomodations involved." The statute referenced at §12182(b)(2)(A)(ii) states "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accomodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accomodations;"

30.     The remedies, procedures, and rights for anyone alleging discrimination in violation of 42

U.S.C. §12132 are set forth in 29 U.S.C. §794a.


31.     At 29 U.S.C. §794a Remedies and Attorney Fees;  in Title 29 Labor, Chapter 16,

Vocational Rehabilitation and Other Rehabilitation Services, Subchapter V, Rights and

Advocacy, at ((a)(1) "The remedies, procedures, and rights set forth in section 717 of the Civil

Rights Act of 1964."  In 29 §794a (a)(1) it says the remedies, procedures, and rights in 42 U.S.C.

§2000e-16, including the application of 42 §2000e-5(f) through (k) shall be available with

respect to any complaint by a person aggrieved by a final disposition or failure to take final

action on a complaint. Further in fashioning an equitable affirmative action or remedy a court

may take into account the reasonableness of the cost of an accomodation, and the availability of

alternatives to achieve an equitable and appropriate remedy.


32.     42 U.S.C. 2000e-16 (These sections are under Chapter 21, Civil Rights) at (c) indicates if

aggreived by the final disposition of his complaint or the failure to take final action on his

complaint, he may file a civil action and the head of the department, agency or unit will be the

defendant. §2000e-16(d) says Per Sec. 2000e-5(f) through (k) applicable to civil actions, interest

shall be available to compensate for the delay in payment.


33.     At 42 U.S.C. §2000e-5(f)(1) it states that a civil action may be brought by the person

aggreived as the court may deem just and that the court may appoint an attorney and may

authorize the commencement of an action without the payment of fees, costs, or security.  (f)(2)

indicates that an action may be brought for appropriate temporary or preliminary relief issued in

accordance with Rule 65 of the Fed. R. Civ. P. pending final disposition and that it's the duty of

the court to assign cases for hearing at the earliest practible date and to cause such cases to be in

every way expidited. Then there are other indications of how the court should handle these

cases; §2000-5(f)(3), (f)(4), (f)(5), (g)(1) and at (k) it states the court in its discretion may allow

the prevailing party, excepting the U.S., a reasonable attorney's fee "(including expert fees)" as a

part of costs, and the U.S. shall be liable the same as a private person.


34.     If we then go back to 29 U.S.C. §794a(a)(2)) it says the remedies, rights and procedures

in 42 U.S.C. §2000d et seq. (Under Chapter 21, Civil Rights, Subchapter V Federally Assisted

Programs) shall be available to any person aggrieved by any act or failure to act by any recipient

of federal assistance or Federal provider of assistance under Sec. 794 of this chapter. The

Federal provider in this case is the U.S. Department of Housing and Urban Development (HUD).


35.     When we go to 42 U.S.C. §2000d it says, "No person in the United States shall, on the

ground of race, color, or national origin [insert disability], be excluded from participation in, be

denied the benefits of, or be subjected to discrimination under any program or activity receiving

Federal financial assistance.


36.     42 U.S.C. §2000d-1, it says federal agencies who provide grants, loans, or other financial

assistance to effectuate §2000d, will create rules, regulations and orders to do so and can

terminate funding for an entity who refuses to comply voluntarily. At §2000d-2 it indicates any

such termination of funding can be judicially reviewed. §2000d-4a provides definitions of

programs and activites who receive federal funds. MSHDA meets the definition. At §2000d-7(a)

(1) it says that the State is not immune from suit in Federal court under the 11th amendment for a violation of Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. §794), or any other federal statute that prohibits discrimination by recipients of Federal financial assistance. And at §2000d-7(a)(2) it says in a suit against a state for a violaton of a statute referred to in para.(1), remedies both at law and equity are available to the same extent as for suit against any other public or private entity other than a state.

37.     And back to 29 U.S.C. 794a(b) to conclude the remedies it states in any action or proceeding to support or charge a violation of a provision of this subchapter (Subchapter V, Rights and Advocacy, under Chapter 16, Vocational Rehabilitation and other Rehabilitation Services, of Title 29, Labor), the court in its discretion may allow a prevailing party, other than the U.S., a reasonable attorney's fee as a part of the costs.

38.     In title 24 of the CFR 8.52(a)(1) it says that the responsible civil rights official who finds a recipient has discriminated against persons on the basis of handicap in violation of Sec 504 or this part shall take remedial action as the responsible civil rights official deems necessary to overcome the effects of the discrimination. That finding should have been made. Doe thinks the proper decision would have been made based on the response from the Civil Rights office in D.C., but the Chicago office had a completely different perception of matters.

39.     28 CFR §35.101 Purpose and Broad Coverage (a) This is the part to implement Subtitle A of title II of the Americans with Disabiilities Act of 1990 ( 42 U.S.C. §12131-12134) as Amended which prohibits discrimination on the basis of disability by public entities.

(b) The primary purpose of the ADA Amendments Act of 2008 was to make it easier for people with disabilities to obtain protection under the ADA. The primary object of attention should be whether entities covered under the ADA have complied with their obligations and whether discrimination has occurred.

40.     This part is applicable to MSHDA per §35.102. Under relationship to other laws, §35.103(a) it's indicated that this part should not be construed to apply a lessor standard than the standards under title V of the Rehab Act of 1973 or regulations issued by federal agencies pursuant to that title. And §35.103(b) this part doesn't invalidate or limit other remedies, rights, and procedures of other state, federal or local laws that provide greater or equal protection.

41.     Under §35.104 Definitions there is a laundry list of items identified for auxilliary aids and services as concerns disabilities which are visible, but aids and services for brain-related disabilities only fall into (4) Other similar services and actions. This is absolutely demonstrative of how the general public, which includes whoever wrote this regulation, tends to completely overlook the nature of limitations in brain functioning which are surely common enough that some samples could be included here.

42.     As far as §35.106 the public entity is supposed to make information available to disabled persons regarding this part and its applicability to their services, programs or activites and do so in such a manner as to actually apprise the disabled person of the protections against discrimination available to them. Doe was never so apprised. She found all the law of disability

protections by random fumbling around in the law over an extended period of time when she was unable to convince MSHDA of the existence of disability protections to help Doe mentally cope with the program requirements. At the bottom of papers they sent, they put a statement that they don't discriminate. It doesn't appear that that statement has any real-world application in the way they administer the program. It's just words printed on their forms and letters which they don't give any thought to. Then also on the bottom of the paper, if you don't agree with the paper they sent, you can ask for a hearing. They don't provide any information on the basis of the facts or methodology they used showing what they've done so you might know if they had done anything such that you have a right to object. Like in figuring out rent. Doe could see some formulas in the statute when she (finally) tracked them down (and every time she looks at them when some time has passed she has to relearn how to do it by studying the statute again. (Her math skills are extremely impaired), but MSHDA doesn't provide some of the numbers needed to plug in to get a final number, which is the only number they provide. When She asked for the numbers to do verifications, she was given those for 2015 and 2016 (and their figuring did not appear to be accurate), but not 2014, 2017, or 2018. For 2014, she wasn't even given a paper identifying anything at all about the rent determination in spite of over half a dozen requests. She has records of those dates and from whom requests were made. She found out what she was supposed to pay in 2014 from the landlord telling her. As far as asking for a hearing, she thought it appeared to be all about you can get a lawyer and who copies which documents and they will have someone without a law degree determine what's right. They don't give you any idea what a lawyer would do at a hearing. They don't give any indication of what a lawyer would research or put forth to accomplish anything. Difficult to know what the attorney should do if they haven't provided information on what they have done or why. Someone told her hearings are only meant

to determine facts.  It shouldn't take a bunch of hoopla for them to tell Doe how and why they do

things. She doesn't know how much dispute there can be over which facts. It was her perception

that was was needed was to determine the law, not facts. She doesn't think someone who is not

trained in law should be interpreting it. Besides that, even the 'local' MSHDA office is located in

another town and Doe doesn't have a car.  Doe requested an advocate weeks after arriving in

Michigan because she knew she couldn't deal with a bureaucratic nightmare.  In a hospital you

can get an advocate to review the medical procedures and one to verify the accuracy of and

explain the billing.  But here it was too much to ask to have a buffer of someone who could

verify the accuracy of them following the law procedurally and doing correct figuring of the rent.


43.      28 CFR §35.107 indicates there shall be a responsible person for discrimination

complaints and procedures established to make a complaint.  Doe became aware at some point in

going through statutes that HUD has a designated Equal Opportunity contact in Washington

D.C.. She had already found on the internet that a discriminaton complaint could be sent to the

Department of Justice and sent a complaint to them.  She didn't get a response for a long time so

then sent a request to the Equal Opportunity representative HUD in D.C. The Deparatment of

Justice had also sent him the information Doe had sent them.  The Equal Opportunity

representative in D.C. sent both pieces of Doe's complaint at that point to the HUD Chicago

Field Office saying something to the effect of looking into the matter.  An employee at the

Chicago Field office  confirmed to Doe that she received both of what had  been sent to HUD

and the Department of Justice.  Doe got a response from HUD in Chicago that Doe doesn't have

a foundation for a complaint of discrimination (even though the HUD Equal Opportunity

representative had given indication otherwise) and that her issues have to do with program

administration and that she should contact the HUD office in Detroit. Doe sent four letters with additional information to that office and never got a response.

44.     The definition of disability at 28 CFR §35.108 is something that should be a given that Doe meets. Doe at age 58 could not be getting disability income from Social Security if she were not completely disabled and unable to work, which is one the one of the major life tasks indicated to qualify as disabled per §35.108(c)(1). Doe sent a copy of the new 2018 information that Social Security sends at the end of the year (December 2017) to the local MSHDA office. She annually provides them a copy of information obtained from Social Security regarding the coming year. The copy of the letter sent from Social Security that was provided is one of those fold up style where you tear of the sides and unfold. At the top of the letter it says, "Your New Benefit Amount; Beneficiary's Name:" with Does actual name listed. Then there is a paragraph that states, "Your Social Security benefits will increase by 2% in 2018 because of a rise in the cost of living. You can use this letter as proof of your benefit amount if you need to apply for food, rent, or energy assistance. You can also use it to apply for bank loans or for other business. Keep this letter with your important financial records."

45.     To Doe's surprise this past year, she got a letter back from MSHDA saying they had tried to verify her disability with the VA but the VA would not provide medical information without a release. Doe was sent a VA medical release form to sign. It stated that in lieu of that Doe could provide an (additional) award letter from Social Security that says she's disabled or have the letters HA or DI in the upper right hand corner next to her social security number. I don't know if you can imagine the reaction that Doe had finding that MSHDA was going behind her back

trying to get medical information from the VA. Doe considers this to be the exact kind of thing to drive a crazy person more crazy. Maybe other people would be annoyed or surprised. For Doe this stuff digs deep. MSHDA is fully apprised of Doe's medical diagnosis, a letter from her doctor having been faxed to them November 23, 2013. In fact, Social Security sends letters to reverify one's medical situation. When Doe sent this back to them, they accepted the form signed by her as indication of her medical status and said they did not need to contact her doctor at that time. But for MSHDA, Doe went to the Social Security office, waited in line, and made sure they had the bells and whistles MSHDA demands. Why one federally funded agency can't accept the information from another federal agency in the format that it comes in makes no sense.

46. Same thing when Doe submitted a copy of her medicines prescribed by the VA and calcium is listed which is prescribed for a medical condition. Supplements are a legitimate medical expense if they are prescribed per the IRS and MSHDA has put forth that they use IRS criteria for medical deductions. First they tell Doe they aren't covered. She assures them they are on the IRS list. Months later they say they don't think the form that the VA doctor prints at the VA is sufficent to establish they are prescribed. Doe is not required to get her meds through the VA. Several months back she was out of town and obtained one of her psych medications at Meijer. She did at one time get calcium through the VA, but she has reflux with throat constriction and buys the petits outside the VA because they don't have them available. The list printed at the VA makes it clear to Doe and the VA that Doe gets calcium prescribed for a medical reason. MSHDA told Doe she should get some different doctor statement to make it clear to them. The VA is short doctors. Sometimes it takes months to get some appointments.

Doe's regular physician went back to active duty Army and there was a gap of months to be assigned another regular doctor. MSHDA should be accepting the VA information in whatever format it's provided.

47.     28 CFR §35.130(a) states, "No qualified individual with a disability shall on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity." (b)(1) of §35.130 says, "A public entity, in providing any aid, benefit or service, may not, directly or through contractual licensing or other arrangements on the basis of disability--(i) Deny a qualified individual with a disability the opportunity to participate in, or benefit from the aid, benefit, or service; (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded to others; (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others; (iv) Provide different or separate aids, benefits, or services to individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others; (v) Aid or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that descriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program; (vi) N/A; (vii) Otherwise limit a qualified individual with in the enjoyment, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service; (2) skip; (3) A public entity may not, directly or

through contractual or other arrangements, utilize criteria or methods of administration: (I) That

have the effect of subjecting qualified individuals with disabilities to discrimination on the basis

of disability; (ii) That have the purpose or effect of defeating or substantially impairing

accomplishment of the objectives of the  public entity's program with respect to individuals with

disabilities; or (iii) That perpetuate the discrimination of another public entity if both public

entities are subject to common administrative control or are agencies of the same state. Skip to

(7)(i) A public entity shall make reasonable modifications in policies, practices, or procedures

when the modifications are necessary to avoid discrimination on the basis of disability, unless the

public entity can demonstrate that making the modifications would fundamentally alter the

nature of the service, program, or activity.

48.      28 CFR §35.160 is in Subpart E- Communications. (a)(1) states the the public entity wil

ensure that communication with participants are as effective as communications with others. (b)

(1) indicates that the public entity will provide auxillary aids and services where necessary to

afford individuals with disabilities, including participants an equal opportunity to participate in,

and enjoy the benefits of a service, program, or activity of a public entity. (b)(2) The type of

auxillary aid or service necessary to ensure effective communication will vary in accordance

with the method of communication used by the individual; the nature, length and complexity of

the communication involved; and the context in which the communication is taking place. In

determining what types of auxillary aids and services are necessary, a public entity shall give

primary consideration to the requests of individuals with disabilities.  In order to be effective,

auxillary aids and services must be provided in accessible formats, in a timely manner, and in

such a way as to protect the privacy and independence of the individual with a disability.

28 CFR §35.164 Duties: the public entity doesn't have to take actions that it can demonstrate would result in a fundamental alteratin in the nature of a service, program, or activity or in undue financial and administrative burdens.

49.     28 CFR §35.190 indicates that the federal agencies have responsibility for implementing the compliance procedures identified in Subpart F, which fairly well reiterate the requirements in the statutes. ¯Basically, having received the complaint of Doe, and acting like some resolution would come of it, they totally dropped the ball. They are supposed to insist that MSHDA comply with disability laws or risk losing their HUD grant.

50.     24 CFR §8.4(b)(1)(iii) says that the an agency getting federal money  cannot provide a qualified individual with handicaps with any housing, aid, benefit, or service that is not as effective in affording the individual an equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others.(v) Cannot aid or perpetuate  discrimination against a qualified individual with handicaps by providing significant assistanace to another agency, organization or person who discriminates. (viii) Cannot otherwise limit a qualified individual with handicaps in the enjoyment of any right, provilege, advantage, or opportunity enjoyed by other qualified individuals receiving the housing, aid, benefit or service. (5)(ii) They cannot defeat or substantially impair the accomplishment of the objectives of the program or activity with respect to qualified individuals with handicaps.§8.4(f) The enumeration of specific forms of prohibited discrimination in paragraphs (b) through (e) of this section does not limit the general prohibition in paragraph (a) of this section

## PRAYER FOR RELIEF

51.    Doe requests to be able to amend this complaint in bringing state or constitutional claims
if matters cannot be resolved using federal law and otherwise to make any corrections or
additions as necessary.

52.    Doe requests a declaratory judgment on the issues of being able to get at a minimum, one
60 day voucher extension if she should be required to move again, and also to be able to move
per the HUD statutes and regulations when the unit is ready for a move, not in their manner of
conflicting with federal law by requiring moves on the first of the month.

53.    For specific performance Doe requests that Doe be assigned an advocate who will ensure
timely communications concerning any interactions regarding program requirements. Who will
ensure that housing laws including those dealing with individuals with disabilities are followed
and that annual projections for expenses are deducted concurrent with projected income. And
done so accurately. And that Doe is provided with all the factors used in determining rents given
in a clear and understandable method, in writing, in a timely way.

54.    For specific performance that all prior medical expenses be refigured in the past years
rents and that any difference owing to Doe as a result of such "mandatory" deductions not having
been made. And that adjustments be made annually as needed to account for disparities, so that
ultimately, each and every medical expense is deducted.  Doe requests that any monies owed to
Doe when correct figuring of what accurate rental payment amounts should have been since

arriving in Michigan, that such an amount be paid with interest as permitted in the remedies section of this complaint.

55.    Doe requests specific performance in being given the two bedroom allowance, and utilities for two bedrooms be factored in correcting rents from the time this was changed to one bedroom which is believed to have been in March 2016.

56.    Doe requests specific performance in being given the 120% Fair Market rent also from March 1, 2016.

57.    Doe requests an injunction that no issuance of rental amounts for the next period commencing March 1, 2019 be made until mistakes of the past are corrected.  And Doe requests that Defendants be required to make all corrections and adjustments not later than the end of January 2019.

58.    Doe requests that should it be needed going forward that the Court would appoint an attorney for Doe which is identified in the remedies section of this complaint as an option, and that attorney fees be provided in addition to costs and that expert witness fees also be permitted if needed and those also are delineated in the remedies section above.

59.    If these matters are remanded for agency action, Doe requests that the court would retain jurisdiction until all matters currently pending are properly resolved.

Doe requests an injunction such that a court hearing would be required if for any reason the agency proposes to terminate Doe's voucher.

60.    Doe requests any other relief the court considers to be just and proper.

Date:   November 2, 2018

Respectfully submitted,

/s/

Jane Doe
Pro Se
P.O. Box 230721
Grand Rapids, MI 49523
court.docs.only0@gmail.com
239.537.5966